# In the United States District Court
# for the Southern District of Georgia
# Brunswick Division

| | | |
|---|---|---|
| KENNEDY FUNDING, INC., | * | |
| | * | |
| Plaintiff, | * | |
| | * | |
| vs. | * | CV 212-183 |
| | * | |
| CITY OF BRUNSWICK, GEORGIA, | * | |
| BRYAN THOMPSON, JONATHAN | * | |
| WILLIAMS, CORNELL HARVEY, | * | |
| MARK SPAULDING, ROOSEVELT | * | |
| HARRIS, JR., AND LYNN FREY. | * | |
| | * | |
| Defendants. | * | |

## ORDER

Presently before the Court are a Motion for Partial Summary Judgment filed by Plaintiff Kennedy Funding, Inc. ("KFI"), Dkt. No. 24, and a Motion for Summary Judgment filed by Defendants, including the City of Brunswick and several of its employees. Dkt. No. 27. Defendants' Motion for Summary Judgment is **GRANTED IN PART**. The Court **ORDERS** supplemental briefing and reserves ruling on Plaintiff's Motion for Partial Summary Judgment and the remaining portions of Defendants' Motion for Summary Judgment as described below.

AO 72A
(Rev. 8/82)

## BACKGROUND

The present case involves alleged misrepresentations made by the City of Brunswick, Georgia ("the City") in the course of its review and approval of plats for a planned development project in Brunswick. Beginning in 2004, Gary Waxman and Jeffery Weiner assembled 130 acres of land in Brunswick to create a mixed-use real estate development called "Liberty Harbor." Dkt. No. 26, ¶¶ 1, 2; Dkt. No. 42-1, ¶¶ 1, 2. They did so through various corporations, such as Liberty Harbor Development, Inc., and Jered Properties, LP, collectively identified as Harbor Development, LP ("HDLP"). Dkt. No. 26, ¶ 1. The development plans included a marina, dry rack boat storage, condominiums, individual homes, a retail center, and a hotel. Id. at ¶ 2. The City worked with HDLP in reviewing HDLP's development plans, and City officials met with HDLP on various occasions to discuss the project. Id. at ¶¶ 4, 8-9.

The City has promulgated Subdivision Regulations. Section 400 of the Subdivision Regulations requires the Planning Commission to give final approval before a plat is recorded in the office of the Clerk of the Superior Court of Glynn County. Brunswick, Ga., Code app. B, art. IV, § 400.[1] Additionally, Section 401 requires that:

---

[1] Defendants argued that the printouts of the Regulations that KFI submitted were neither originals nor certified copies and could not be used as evidence. Dkt. No. 49, p. 8. Plaintiff subsequently submitted certified

AO 72A
(Rev. 8/82)

The transfer of, sale of, agreement to sell, or negotiation to sell land by reference to or exhibition of, or other use of a plat of a subdivision that has not been given final approval by the Planning Commission and duly recorded in the office of the Clerk of the Superior Court of Glynn County is declared to be a misdemeanor and may be enjoined or invalidated by appropriate action. In addition, such illegal use of a plat is subject to the penalties for a misdemeanor, as provided by law, for each lot or parcel so transferred, sold, or agreed to be sold.

The description by metes and bounds in the instrument of transfer, or other document used in the process of selling or transfer, shall not exempt the transaction from such penalties, as stated above.

Brunswick, Ga., Code app. B, art. IV, § 401. Therefore, Section 401 prevents subdivision lots from being sold until plats are recorded. See id. Section 702 requires an "acceptable performance guarantee" to be posted where improvements have not yet been completed. Under this section:

If all improvements as required by the Planning Commission in granting tentative approval of the preliminary plat are not properly installed and constructed in accordance with the required standards prior to the submission of a final plat application, the subdivider shall file with the City Manager an acceptable performance guarantee to insure future installation and construction as required.

The performance guarantee must be approved by the City Commission and City Attorney, and must include a specific, reasonable and satisfactory date for the completion of the necessary improvements. In no case shall the performance guarantee be valid for more than two (2) years.

---

copies of the Regulations in question and attached them to Dkt. No. 53 as Exhibit 3. The proper form of the Regulations is now before the Court, and Defendants made no further argument on this point.

AO 72A
(Rev. 8/82)

Brunswick, Ga., Code app. B, art. VII, § 702.  According to the

Regulations, the guarantee shall be released and returned after

improvements are completed and approved.  Brunswick, Ga., Code

app. B, art. VII, § 702.1.  If a subdivider fails to complete

the required improvements within the allotted time frame, the

performance guarantee is forfeited to the City.  The language

states:

> In the event the subdivider fails to install or
> construct the required improvements during the
> specific time allotted and in conformity with these
> regulations, the performance guarantee is forfeited to
> the City of Brunswick to be used for the completion of
> the improvements.

Brunswick, Ga., Code app. B, art. VII, § 702.2.

Section 701 of the Subdivision Regulations also makes

reference to the need for the City to ensure certain

infrastructure and improvements are properly installed or

otherwise that an adequate guarantee has been posted to ensure

the eventual installation of the required improvements.  See

Brunswick, Ga., Code app. B, art. VII, § 701; Dkt. No. 44-1, p.

15.

HDLP contemplated developing Liberty Harbor in phases.  The

Phase I Liberty Harbor plat was filed in August 2006, and the

Phase II plat was filed in October 2006.[2]  Dkt. No. 26, ¶ 14;

Dkt. No. 27-3, ¶ 8.  Both plats were stamped with certifications

---

[2] In later filings, Plaintiff asserts that the final plat for Phase II was
filed November 4, 2006.  Dkt. No. 44-1, p. 6.

AO 72A
(Rev. 8/82)

stating that performance was guaranteed. The Phase I

certifications were dated August 3, 2006, and the Phase II

certifications were dated October 16, 2006. The stamps read:

> I certify that all water system and sewer disposal
> systems have been properly installed and approved; or
> certification by the City Manager that an adequate
> performance guaranty has been posted to ensure the
> eventual installation and construction of all required
> water and sewer improvements as the standards
> required;
>
> I certify that all road and drainage improvements
> required by this ordinance have been properly
> installed and constructed in accordance with the
> required standards; or certification by the City
> Manager that an adequate performance guaranty has been
> posted to ensure the eventual installation and
> construction of all required road and drainage
> improvements as the standards required.

Dkt. No. 25-1, Ex. 1.





The parties dispute whether the requisite infrastructure improvements were completed after the plats were filed. Dkt. No. 26, ¶¶ 15-16; Dkt. No. 27-1, p. 11. According to Dan McFee ("McFee"), City Engineer, a letter of substantial completion for the Phase I sanitary lift station and sewer system was issued by the project engineer on May 22, 2008, and the Phase I water, road, and storm drainage systems were completed before the letter was issued. Dkt. No. 27-5, ¶ 8. The City issued a Certificate of Occupancy for the only residential structure built at Liberty Harbor. Dkt. No. 26, ¶ 37; Dkt. No. 42-1, ¶ 37. According to Plaintiff, the Certificate of Occupancy was issued prior to completion of the infrastructure. However, McFee affied that all necessary infrastructure was installed and that any house built in Phase I today would be entitled to a certificate of occupancy as well. Dkt. No. 27-5, ¶ 10.

A manufacturing facility, Jered Industries,[3] located within Liberty Harbor, has not yet been relocated and undisputedly serves as an impediment to certain further improvements. Dkt.

---

[3] Jered Industries is a manufacturer of defense and commercial marine systems that had a long-term lease on a significant portion of the platted Phase II of Liberty Harbor. Dkt. No. 27-4, ¶ 9. Because Jered's facility was aging, Jered was amenable to relocating to a different part of Brunswick with help from HDLP and the City. Id. According to Mayor Bryan Thompson, progress was made toward relocating Jered, but HDLP stopped responding to communications from Jered and the City by the middle of 2008. Id. at ¶¶ 10-11. City representatives sent a letter to Liberty Harbor dated September 19, 2008, notifying Liberty Harbor representatives that because of the stalled progress in relocating Jered, efforts would instead be put toward obtaining funding for Jered to fulfill its lease obligations in the original location. Dkt. No. 27-4, Ex. B.

AO 72A
(Rev. 8/82)

No. 26, ¶ 35; Dkt. No. 42-1, ¶ 35. According to McFee, the Jered facility and all other abandoned industrial buildings on the site would have to be demolished before infrastructure could be installed on the Phase II property. Dkt. No. 27-5, ¶ 12.

A key facet of Plaintiff's suit is its belief that the City must comply with regulation Section 702 and its requirement of a performance guarantee. Defendants maintain that they did not need to comply with Section 702. Lynn Frey ("Frey"), the former City Attorney, states that Gene Stancak, who was the developer of Liberty Harbor, contacted Frey to inquire about whether a different regulation, Section 903, applied to Liberty Harbor and could be used to work around the rule prohibiting a subdivider from selling lots until the filing of a final plat. Dkt. No. 27-6, ¶ 5. Section 903 provides:

> In the case of plans for large-scale developments, the standards and requirements of these regulations may be modified by the Planning Commission if the development:

(A) Achieves substantially the objectives of these regulations;

(B) Is further protected by covenants or other legal provisions as will assure conformity to and achievement of the plan;

(C) Contains or is bounded by major streets as necessary;

(D) Contains reserved areas of sufficient size to serve its population for playgrounds, parks, and other such open space;

AO 72A
(Rev. 8/82)

(E)  Is provided with public water and sewage facilities;[4]
and

(F)  Is situated in a PD – Planned Development Zoning
District and developed in accordance with the
provisions that apply to this district.

Brunswick, Ga., Code app. B, art. IX, § 903.  According to the

Preamble and Enactment Clause of the Subdivision Regulations,

the regulation exists for the following purposes:

(A)  To encourage economically sound and stable land
development;

(B)  To assure the provision of required streets,
utilities, and other facilities and services to new
land developments;

(C)  To assure the adequate provision of safe and
convenient traffic access and circulation, both
vehicular and pedestrian, in new land developments;

(D)  To assure the provision of needed public open
spaces and building sites in new land developments
through the dedication or reservation of land for
recreational, educational and other public purposes;
and

(E)  To assure that land is developed in conformity
with the Comprehensive Plan for Brunswick and Glynn
County, Georgia, as amended from time to time.

Brunswick, GA., Code app. B, art. I.

---

[4] Plaintiff contends that Section 903(E) was not satisfied because Liberty
Harbor was not provided with public water and sewage facilities, since these
improvements were not yet dedicated to the City.  Dkt No. 44-1, pp. 18-19.
Arne Glaeser ("Glaeser"), City Planner, stated that the Section 903(E)
requirement was merely "intended to distinguish between developments that
will be served by water and sewer systems, and those that will be served by
well and septic systems."  Dkt. No. 42-2, ¶ 5.  Glaeser stated that the City
does not install water and sewer infrastructure in private developments.
Instead, developers do so and dedicate the systems to the City, once
completed.  Id. at ¶ 4.  According to Glaeser, a development is considered to
be "provided with public water and sewage facilities" as soon as a developer
submits a development plan that is served by water and sewer systems rather
than well and septic systems.  Id. at ¶ 8.

AO 72A
(Rev. 8/82)

After Frey determined that Liberty Harbor was a planned large-scale development meeting the requirements set forth in Section 903, he advised the City Council that Section 903 allowed the Council to modify the Subdivision Regulations as long as the modifications substantially achieved the objectives of the Regulations. Dkt. No. 27-6, ¶ 6. He also opined that Section 903 gave the City the flexibility to forego any infrastructure certification on the plats, but the City still wanted to memorialize the fact that an infrastructure agreement existed. Dkt. No. 27-6, ¶ 9. Frey and the City Council shared the belief that Section 702 did not apply to Liberty Harbor. Dkt. No. 27-6, ¶ 8. Defendants decided to require that infrastructure be installed after the lots were sold but before any Certificate of Occupancy would be issued. Dkt. No. 27-4, ¶ 7. The Defendants further determined that Liberty Harbor, LLC,[5] would provide a guarantee, although not one that required monetary backing. See Dkt. No. 27-4, Ex. A. Plaintiff characterizes this guarantee as a naked promise. Dkt. No. 1-1, ¶ 35.

On March 31, 2006, Liberty Harbor, LLC wrote to Bryan Thompson, Mayor of Brunswick, stating, "Liberty Harbor, LLC, hereby guarantees that the on-site infrastructure, as detailed

---

[5] Plaintiff describes Liberty Harbor, LLC as a general or limited partner in HDLP. Dkt. No. 26, ¶ 23.

AO 72A
(Rev. 8/82)

on our site plans and accompanying documents, will be completed

by the time that the buildings to be constructed are ready for

occupancy." Dkt. No. 25-2, p. 4. On May 16, 2006, Roosevelt

Harris, Jr., City Manager, wrote to Liberty Harbor, LLC, noting:

> City approval of your preliminary and final plat
> submittals will be conditioned upon and subject to our
> receipt of written documentation from Liberty Harbor
> LLC supporting its guarantee set forth in your letter
> to Mayor Bryan Thompson dated March 31, 2006, that it
> will follow through in a timely manner on its design
> and construction of all of the infrastructure
> components as depicted in its graphic and narrative
> plans approved by the City in the course of the
> subdivision approval process.

> These necessary items shall include water, wastewater,
> stormwater/drainage and other utilities, as well as
> all street, curbing/gutter, walkway/sidewalk, parking,
> recreational/greenspace and other facilities as
> required and approved by the City. Liberty Harbor LLC
> shall submit to me, prior to final plat approval, a
> proposed schedule of activities for staff review and
> approval by the City Commission. In the event Liberty
> Harbor LLC fails to adhere to the design, approval,
> and construction schedule . . . as approved, the City
> may require Liberty Harbor LLC to provide the City
> with further assurance of completion, which may
> include a deposit in sufficient form and amount as
> shall be agreed upon by the parties. In such event the
> City will notify Liberty Harbor LLC in writing of the
> terms of additional assurances it requires.

> In no event will the City issue any Certificate of
> Occupancy or allow use of any residence or other
> structure within the subdivision in the absence of
> completed infrastructure.

Dkt. No. 27-4, Ex. A.

Paul Levine, Manager of Implementations for Liberty Harbor,

LLC, signed a statement "represent[ing] and guarantee[ing] that

[Liberty Harbor LLC] will timely construct all infrastructures as shall be approved by the City of Brunswick." Id. After receiving this promise from Liberty Harbor, LLC, Frey notified McFee that the City "received an acceptable guarantee that infrastructure would be installed in a manner that accomplished the goals of the Subdivision Ordinance." Dkt. No. 27-6, ¶ 9. McFee then certified on the plats that the City received an acceptable guarantee that infrastructure would be installed in a matter that satisfied the goals of the Subdivision Regulations. Dkt. No. 27-5, ¶ 6. Although the City now contends that Section 702 does not apply, McFee stated that he stamped the plats with language similar to that in Section 702 of the Subdivision Regulations "for convenience." Id.

Prior to making the loan to HDLP, Plaintiff sought legal counsel from attorney Scott Calhoun ("Calhoun"). Calhoun advised Plaintiff on whether HDLP received required permits and approvals for Liberty Harbor. Calhoun stated that he noted the stamps bearing McFee's certification and that, in his experience, attorneys searching property records commonly rely on official stamps placed on these kinds of records by governmental officials. Dkt. No. 44-3, ¶¶ 10, 11. Calhoun attested that because of the stamps, he did not feel the need to inquire further regarding whether an adequate performance

AO 72A
(Rev. 8/82)

guarantee had been obtained, and he relied on the

certifications.  Id. at ¶ 11.  According to Calhoun:

> Nothing on the plats or in the certifications gave me
> any reason to suspect that the City had accepted a
> mere promise from the developer as a performance
> guarantee; rather, based on the clear, unambiguous
> language of the certifications, I understood that the
> water system and sewer disposal systems and the road
> and drainage improvements required by ordinance had
> been properly installed, approved or constructed or
> that an 'adequate performance guaranty ha[d] been
> posted to ensure the eventual installation and
> construction of all required' infrastructure. As such,
> I expected that if the developer defaulted and/or
> failed to install the improvements, the City would
> stand behind their certification.

Dkt. No. 44-3, ¶ 13.

On May 8, 2007, KFI closed on a loan to HDLP for

$55,000,000, which was secured by unsold Liberty Harbor lots,

out parcels, and other realty and personalty pursuant to

security instruments.  Dkt. No. 26, ¶ 31; Dkt. No. 42-1, ¶ 31.

HDLP assigned its rights to leases, rent, and other assets as

collateral for the loan.  Id.  HDLP has defaulted on the loan.

Dkt. No. 26, ¶ 33.  KFI foreclosed on the property in February

2013.  Dkt. No. 50, p. 9.

## LEGAL STANDARD

Summary judgment is appropriate "if the movant shows that

there is no genuine dispute as to any material fact and the

movant is entitled to judgment as a matter of law." FED. R. CIV.

P. 56(a).  Facts are considered "material" where they "might

affect the outcome of the suit under the governing law[,]" and issues of material fact are considered "genuine" where "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Anderson v. Liberty Lobby, Inc. 477 U.S. 242, 248 (1986). The party seeking summary judgment must first identify grounds that show the absence of a genuine issue of material fact. Celotex Corp. v. Catrett, 477 U.S. 317, 322-24 (1986). To discharge this burden, the movant must show the court that there is an absence of evidence to support the nonmoving party's case. Id. at 325. The burden then shifts to the nonmoving party, who can defeat the motion for summary judgment by going beyond the pleadings and presenting affirmative evidence from which a jury might return a verdict in its favor. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 257 (1986).

The court must view the evidence and draw all inferences in the light most favorable to the nonmovant. Adickes v. S.H. Kress & Co., 398 U.S. 144, 157-59 (1970). When, as here, the parties have both filed motions for summary judgment, the applicable Rule 56 standard is not affected. See Gerling Global Reinsurance Corp. of Am. v. Gallagher, 267 F.3d 1228, 1233 (11th Cir. 2001). "[T]he facts are viewed in the light most favorable to the non-moving party on each motion." Chavez v. Mercantil Commercebank, N.A., 701 F.3d 896, 899 (11th Cir. 2012).

AO 72A
(Rev. 8/82)

## DISCUSSION

Plaintiff alleges that Defendants falsely stamped the plats with representations indicating the presence of an adequate performance guarantee when in fact none existed. According to Plaintiff, the stamps on the plats were misrepresentations because the certifications were not backed by financial guarantees. Dkt. No. 1-1, ¶ 34-35. Plaintiff contends that it relied on these stamps in deciding to make a $55,000,000 loan to HDLP and that the value of the collateral securing the loan is now sharply reduced because the infrastructure is incomplete. Id. at ¶¶ 43, 52-54, 77. Plaintiff states that, had it known the guarantee was unsupported financially, it could have refrained from making the loan or could have required that an assurance be posted. Id. at ¶ 54. Plaintiff's remaining claims are for mandamus, fraud, and conspiracy.[6] Plaintiff moves for partial summary judgment on the issue of whether Defendants violated the Subdivision Regulations by not requiring a monetary guarantee. Dkt. No. 25, p. 25. Defendants move for summary judgment on all of Plaintiff's claims. Dkt. No. 27. Defendants assert that Plaintiffs are not entitled to mandamus, Dkt. 27-1, pp. 33-34, and that Plaintiff failed to provide the City with proper ante litem notice. Id. at p. 3. Defendants further

---

[6] Plaintiff withdrew claims for negligence, claims under § 1983, and breach of contract claims. See Dkt. No. 44-6, p. 7.

14

contend that the City and its officials are entitled to immunity from suit, Plaintiff's fraud claim is barred by the statute of limitations, and Plaintiff's fraud claim fails on the merits. Id. at pp. 16, 20, 42.

## I.  **Mandamus**

Under Georgia law, a writ of mandamus may issue to compel a public officer to perform a legally required duty, when a defect of justice would follow from a failure to perform or improper performance of the duty and where there is no other legal remedy for the rights at issue.  O.C.G.A. § 9-6-20.  Mandamus is an extraordinary remedy that is appropriate only when the claimant has a clear legal right to the relief sought.  Bland Farms, LLC v. Ga. Dep't of Agric., 637 S.E.2d 37, 39 (Ga. 2006)(quoting Schrenko v. DeKalb Cnty. Sch. Dist., 582 S.E.2d 109, 116 (Ga. 2003)).  The duty that the claimant seeks to enforce must be one "arising by law, either expressly or by necessary implication; and the law must not only authorize the act to be done, but must require its performance."  Bland Farms, 637 S.E.2d at 39 (quoting Gilmer Cnty. v. City of East Ellijay, 533 S.E.2d 715, 717 (Ga. 2000)).

Ordinarily mandamus will not lie if the law related to the duty at issue gives the official or agency discretion regarding whether action is required in a particular instance, see Bibb Cnty. v. Monroe Cnty., 755 S.E.2d 760, 766-67 (Ga. 2014), but it

AO 72A
(Rev. 8/82)

will lie to control the conduct of an officer vested with discretion "where the exercise of that discretion has been so capricious or arbitrary as to amount to a gross abuse." Scarborough v. Hunter, 746 S.E.2d 119, 123 (Ga. 2013). Even where mandamus does compel the performance of discretionary acts, "mandamus will not lie to dictate the manner in which the action is taken or the outcome of such action." Bibb Cnty., 755 S.E.2d at 767.

Whereas duties and acts involving the exercise of discretion generally are not appropriately compelled by mandamus, duties and acts that are considered "ministerial" rather than "discretionary" may be properly compelled by mandamus. See Duty Free Air & Ship Supply Co./Franklin Wilson Airport Concession, Inc. v. City of Atlanta, 646 S.E.2d 48, 49–50 (Ga. 2007)(finding mandamus could not compel City Council and mayor to execute a contract because approval duties were considered discretionary).

> Where the duty in a particular situation is so plainly prescribed as to be free from doubt and equivalent to a positive command it is regarded as being so far ministerial that its performance may be compelled by mandamus, unless there be provision or implication to the contrary. But where the duty is not thus plainly prescribed but depends upon a statute or statutes the construction or application of which is not free from doubt, it is regarded as involving the character of judgment or discretion which cannot be controlled by mandamus.

AO 72A
(Rev. 8/82)

<u>Wilbur v. United States ex rel. Kadrie et al.</u>, 281 U.S. 206, 218-19 (1930).

Mandamus is a prospective remedy. <u>Ianicelli v. McNeely</u>, 527 S.E.2d 189, 191 (Ga. 2000). It is not available "to compel the undoing of acts already done or the correction of wrongs already perpetrated." <u>Coastal Serv., Inc. v. Jackson</u>, 154 S.E.2d 365, 366 (Ga. 1967)(quoting <u>Wilson v. Sanders</u>, 151 S.E.2d 703, 705 (Ga. 1966)). Though mandamus may issue to compel the performance of specific duties,

> it will not lie to compel a general course of
> conduct or the performance of continuous duties
> nor will it lie where the court issuing the writ
> would have to undertake to oversee and control
> the general course of official conduct of the
> party to whom the writ is directed.

<u>Speedway Grading Corp. v. Barrow Cnty. Bd. Of Comm'rs</u>, 373 S.E.2d 205, 207 (Ga. 1988)(quoting <u>Solomon v. Brown</u>, 128 S.E.2d 735, 736 (Ga. 1962)). Mandamus will not be granted where it would, for any reason, be nugatory or fruitless. O.C.G.A. § 9-6-26.

In the present case, Plaintiff seeks an order of mandamus to compel the City of Brunswick "to install the infrastructure that should have been installed with the performance guarantee had the correct, monetarily funded, guarantee been obtained." Dkt. No. 50, p. 17. Plaintiff contends that the following

AO 72A
(Rev. 8/82)

language of Section 702 contemplated a clear legal duty that was

ministerial in nature:

> If all improvements, as required by the Planning
> Commission in granting tentative approval of the
> preliminary plat are not properly installed and
> constructed in accordance with the required standards
> prior to the submission of a final plat application,
> the subdivider shall file with the City Manager an
> acceptable performance guarantee to insure future
> installation and instruction as required . . .

> 702.2 *Default of Guarantee.* In the event the
> subdivider fails to install or construct the required
> improvements during the specific time allotted and in
> conformity with these regulations, the performance
> guarantee is forfeited to the City of Brunswick to be
> used for the completion of the improvements.

Brunswick, Ga., Code app. B, art. VII, § 702. The language of

the Regulations frames the duty as belonging to the subdivider.

Plaintiff contends that these clauses necessarily required the

City to make sure the subdivider provided the guarantee. Dkt.

No. 44-1, p. 21; Dkt. No. 70, p. 6. If the subdivider did not

complete the required improvements, the City was required to

complete the improvements using the forfeited guarantee. Dkt.

No. 70, p. 7. Defendants maintain that they appropriately

deviated from the standard requirements by proceeding under

Section 903.

As apparent from the parties' differing contentions

regarding the applicable provision and requirements of the

Regulations, it is not free from doubt that the Regulations

require Defendants to complete the infrastructure and

AO 72A
(Rev. 8/82)

improvements if they did not obtain a monetary performance guarantee. Moreover, Defendants have significant discretion in the subdivision approval process generally and in the obtention of performance guarantees specifically. Defendants do have the discretion to proceed under Section 903 where the development, *inter alia*, "[a]chieves substantially the objectives of [the subdivision] regulations[,]" and Defendants are responsible for making that determination. Even if the guarantee contemplated by Section 702 is a monetary one, the City Commission and City Attorney have discretion to decide what constitutes "an acceptable performance guarantee," which is not clearly defined in the ordinance. Plaintiff cites cases which state that, even when an official is vested with discretion, mandamus will lie when an official's conduct has been so arbitrary and capricious as to constitute a gross abuse of that discretion. The Court does not find any support that such an abuse of discretion took place, particularly in light of Plaintiff's primary contention that the required acts were ministerial and the lack of argument or facts supporting the contention that Defendants' choices were so arbitrary and capricious as to constitute a gross abuse of discretion.

Defendants cannot now obtain a monetary performance guarantee from HDLP. Holding them financially responsible for their failure to do so eight years ago would constitute an

AO 72A
(Rev. 8/82)

attempt to undo acts and decisions in the distant past. See Ianicelli, 527 S.E.2d at 191 (affirming denial of mandamus to invalidate recent election because mandamus cannot compel the undoing of acts already done even if the act in question was illegal); Atlanta Indep. Sch. Sys. v. Lane, 469 S.E.2d 22, 24, 26 (denying mandamus relief where school system received sales tax receipts in violation of the Georgia Constitution because mandamus cannot compel undoing of acts already done). It would be nugatory and fruitless to order Defendants to obtain a monetary guarantee from HDLP, because HDLP is no longer in the picture, and the guarantee that Defendants did obtain, as Plaintiffs have pointed out, would be worthless if forfeited. Moreover, because of the current state of the property, completion of the infrastructure by the City would be practically impossible. See Kirkland v. Lowry, 165 S.E. 111, 112 (Ga. 1932)("If the act sought to be coerced by mandamus has become impossible of performance, it is immaterial that the defendant's own misconduct may have rendered its performance impossible."). Further, mandamus in this situation would compel a course of continuous conduct and the performance of continuous duties that the Court would have to oversee and control. Mandamus cannot lie in such circumstances.

The parties dispute whether Plaintiff's request for damages undermines the contention that mandamus is the only adequate

20

legal remedy available. Dkt. No. 42, p. 20; Dkt. No. 50, pp. 17-18. "[I]f another legal remedy is available, mandamus is not" because Georgia law does not allow the "stacking of remedies." Rabun Cnty. v. Mountain Creek Estates, LLC, 632 S.E.2d 140, 144 (Ga. 2006)(reversing award of damages barred by sovereign immunity and finding mandamus relief appropriate where damages were thus unavailable). Some Georgia cases have allowed plaintiffs to recover damages for past harm and relief to prevent future harm. See Starship Enterprises of Atlanta, Inc. v. Coweta Cnty. Ga., 708 F.3d 1243, 1255 n. 15 (11th Cir. 2013)(finding res judicata applied when plaintiff did not bring petitions for damages and mandamus together because mandamus does not bar incidental damages for past harm). In the absence of a clearly required legal duty, the Court need not reach the question of whether or not awarding Plaintiff both damages and mandamus relief would constitute double recovery.

For all of these reasons, mandamus is inappropriate as a matter of law, and Defendants are entitled to summary judgment on the mandamus claim.

## II. Fraud and Conspiracy

### a. Qualified Immunity

The doctrine of official or qualified immunity offers public officers and employees protection from suit in their personal capacity. Cameron v. Lang, 549 S.E.2d 341, 344 (Ga.

2001).  An officer or employee may be personally liable only where he or she performed a ministerial act negligently or performed any act with malice or an intent to injure.  Id. Intent to injure means "actual intent to cause harm to the plaintiff, not merely an intent to do the act purportedly resulting in the claimed injury."  Kidd v. Coates, 518 S.E.2d 124, 125 (Ga. 1999)(internal quotations and citations omitted). The purpose of this immunity is to allow public employees to operate independently without fear of lawsuits and to prevent review of such employees' judgment in hindsight.  Cameron, 549 S.E.2d at 344.  Whether an employee is entitled to qualified immunity is a question of law for the court to decide.  Weaver v. City of Statesboro, 653 S.E.2d 765, 770 (Ga. Ct. App. 2007).

Ministerial acts are those that are "simple, absolute, and definite, arising under conditions admitted or proved to exist, and requiring merely the execution of a specific duty"; whereas discretionary acts involve "the exercise of personal deliberation and judgment . . . examining the facts, reaching reasoned conclusions, and acting on them in a way not specifically directed.  Id. at 771 (quoting Nichols v. Prather, 650 S.E.2d 380, 386–87 (Ga. Ct. App. 2007)).

In the context of its mandamus claim, Plaintiff asserts that the acts and obligations at issue—requiring a monetary guarantee to ensure the completion of the required

22

infrastructure—were ministerial in nature. Dkt. No. 44-1, p.
21-22; Dkt. No. 53, p. 22. According to Plaintiff, the language
of Section 702 is absolute and not subject to discretion. The
Court finds that the acts at issue in this case involved
significant discretion. Defendants contend that they deviated
from the requirements of Section 702 by operating under Section
903. Regardless of the propriety of operating under Section 903
in this case, Defendants have the discretion to operate under
Section 903 in appropriate cases and to determine, through the
exercise of deliberation and judgment, in which cases deviation
is appropriate. Even under the normal requirements of Section
702, the language of the Regulations requires the City and its
officials to approve an "acceptable performance guarantee,"
which is a discretionary determination. See Happoldt v.
Kutscher, 567 S.E.2d 380, 383-84 (Ga. Ct. App. 2002)(finding
portion of county ordinance requiring officer to ensure drainage
system was "adequate" involved a discretionary determination
whereas portion of ordinance requiring officer to ensure grading
met clearly defined numerical requirements was ministerial).

Even assuming Defendants did act with intent to induce
reliance as alleged and required to establish Plaintiff's fraud
claim, there are no facts in the record suggesting that
Defendants acted with intent to injure Plaintiff. This being
the case, Defendant officers acting in their personal capacity

AO 72A
(Rev. 8/82)

are protected from liability on the basis of qualified immunity. Defendant's Motion for Summary Judgment as it pertains to Plaintiff's claims of fraud and conspiracy by Defendant officers in their personal capacity is **GRANTED**.

### b. Ante Litem Notice

O.C.G.A. § 36-33-5 requires those with claims for money damages against a municipality arising from injuries to person or property to present their claims to the municipality within six months of the event on which the claim is based. This ante litem notice requirement is a condition precedent that must be met prior to bringing suit. City of Chamblee v. Maxwell, 452 S.E.2d 488, 489 (Ga. 1994). The claim must be presented in writing to the city, and "[n]o action shall be entertained by the courts against the municipal corporation until the cause of action therein has first been presented to the governing authority for adjustment." O.C.G.A. § 36-33-5(b). Once ante litem notice is given, a plaintiff may only bring suit after the governing authorities have acted on the claim or failed to act on it within thirty days. Jones v. City of Austell, 305 S.E.2d 653, 654 (Ga. Ct. App. 1983). The purpose of the statute is to allow the municipality to investigate the claim and decide whether to resolve the claim without suit or to contest it in the courts. Dennis v. City of Palmetto, 202 S.E.2d 717, 717 (Ga. Ct. App. 1973). The requirement applies in suits brought

24

against municipal officers in their official capacity, as these are in reality suits against the municipality.  Conley v. Dawson, 572 S.E.2d 34, 36-37 (Ga. Ct. App. 2002).

Ante litem notice was first raised as a defense in the Answer of Defendants to Plaintiff's Complaint, Dkt. No. 8, p. 2, and subsequently mentioned in Defendants' Brief in Support of Their Motion for Summary Judgment.  Dkt. No. 27, p. 3 ("[A]ny claim sounding in tort - in particular, the claim for negligence - is also barred by KFI's failure to provide timely ante litem notice to the City.").  Defendants discussed the ante litem notice requirement primarily in relation to Plaintiff's negligence claim, Dkt. No. 27, pp. 28-29, and Plaintiff dropped its negligence claim after the Court raised this issue at the Motions Hearing on October 9, 2013.  Dkt. No. 41, 16:15-19; Dkt. No. 44-6, p. 7.

The Court directs the parties to address whether Plaintiff was required to give notice to the City of its claim for fraud pursuant to O.C.G.A. § 36-33-5 and whether summary judgment is properly granted in the absence of ante litem notice, within seven (7) days of the filing of this Order.

### c. Sovereign Immunity

The City contends that KFI has not met the burden of showing that the City waived sovereign immunity.  Dkt. No. 27-1, p. 42. The insurance policies submitted thus far appear to be

incomplete. The Court directs the parties to file any and all insurance policies that applied during the years of 2006 to 2012 within seven (7) days of this Order.

## CONCLUSION

The Court reserves ruling on Plaintiff's Partial Motion for Summary Judgment and Defendants' Motion for Summary Judgment as it pertains to Plaintiff's claims of fraud and conspiracy by the City and its officers in their official capacity, until such time as supplemental briefing has concluded.

For the reasons stated above, Defendants' Motion for Summary Judgment is **GRANTED IN PART** regarding the mandamus claim as well as the fraud and conspiracy claims against Defendant officers in their individual capacity. Plaintiff's claims of fraud and conspiracy against the City and its officers in their official capacity remain. It is **ORDERED** that the parties provide supplemental briefing on the issue of ante litem notice and submit the aforementioned insurance policies within seven (7) days of this Order.

AO 72A
(Rev. 8/82)

**SO ORDERED,** this 29TH day of September, 2014.

LISA GODBEY WOOD, CHIEF JUDGE
UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF GEORGIA

AO 72A
(Rev. 8/82)